FILED

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF PENNSYLVANIA

2020 JUN 15   AM 8:38

U.S. BANKRUPTCY COURT

| | | |
|---|---|---|
| In re: Jeffery Houser | ) | case no. |
| | ) | |
| Chap. 13 case | ) | **OBJECTIONS TO PROOF OF** |
| | ) | **CLAIM BY CASCADE MORTGAGE** |
| CASE # 20-12258 | ) | **FUNDING TRUST 2017-1 (sic)** |
| | ) | |

## OBJECTIONS TO PROOF OF CLAIM IN RE: "CASCADE MORTGAGE FUNDING TRUST 2017-1", WHICH IS NOT A PERSON BUT AN SEC FILING CERTIFICATE

1.    A standard 410 form "Proof of Claim" was filed on behalf of the so-called "plaintiff" or "creditor" named "Cascade Mortgage Funding Trust 2017-1", which is neither a creditor, or <u>even a person or entity capable of bringing suit</u> or being sued. It is an SEC filing Certificate, a "stock name" for issuance as an "MBS" (mortgage backed security". It is not a "Trust" and has no address, no executive, no owners or beneficiaries, no tax ID #, and no means to take payment.

2.    See Proof of Claim ("POC") **no. 1**, which states that "other names used" include "Specialized Loan Servicing LLC". A securitization file is not "also known" as an account servicing LLC. **The LLC is not a creditor** and does not also do business under the name "Cascade Mortgage Funding Trust 2017-1".

3.    Nor does Specialized Loan Servicing LLC "represent" or act as an "agent" for a stock certificate series ( a role reserved to the *securitization trustee*). The whole thing is a swindle, a greasy shystering act of <u>perjury</u> on a federal form. They cannot take payment for anyone, even if they will take anyone's payment.

4.    Because "Cascade Mortgage Funding Trust 2017-1" is not even a person of any description, POC **no. 3** is also completely wrong. Payments may NOT be "sent" to "Specialized Loan Servicing LLC", although they doubtless gladly take any

1

"payments" that were inadvertently "sent". Nothing anyone could pay them will "credit" anything else, they have no standing and no interest in this bankruptcy estate. Nobody is at home and the mortgage claim is completely false.

5. "Specialized Loan Servicing LLC" does not service or represent any **creditor**, and their POC does not even name or identify the securitization trustee, which at least stands for something in the equation. See attached treatise published by the American Bankers Association, and the well known publication by "U.S. Bank as Corporate Trustee", which plainly described the roles in this transaction.

6. Whoever filed this "POC" is pleading on behalf of a *stock certificate*. They cannot identify a creditor, and have no claims to make or prove. Even the "account history" is garbled nonsense, and makes no exception to the hearsay rule for "business records". It is not verified by anyone "*at or near the creation of an event, account or incident*". It is manufactured hearsay nonsense.

7. See POC **no. 2**, which states that "the claim was not acquired from **someone else**". How is it remotely possible that a securitization "trust" (mortgage backed certificate series") is the originator of some "claim" and did not acquire it from "someone else"? Do stock certificates and mortgage servicers walk up to houses and lend money? Even their own supporting documentation shows there have been a series of mortgage transfers originating long ago in a very different entity.

8. See POC **no. 8**, which states "money loaned" as the "basis" for this fraudulent "claim". Where is the evidence in books and records showing a debit and a credit for "money loaned"? All mortgage notes must be assigned in writing before a notary public, and all mortgage assignments must be recorded with the power of attorney (or signature by the grantor itself), just as the original.

9. Each so-called "transfer" is void as a matter of law. Nobody lent any money, and **we very safely and absolutely deny** that "Specialized Loan Servicing LLC" or "Cascade Mortgage Funding Trust 2017-1" ever lent anyone "money", or anything else. They plainly falsified the statement that the "mortgage loan" was originated by this so-called *Claimant*, and the affiant has made a false claim.

2

10.    Additionally, it is evident that the so-called "mortgage claim" is completely unsecured, after failing to mark the line at POC. **no 9** which items the "property value". The subject property (our home) is worth less than $100,000, and it is publicly assessed by Northampton County for "$124,800", noting the attached printout from the local tax assessors website. The present and so-called "Proof of Claim" is radically false, and equally impossible.

11.   If anyone somehow "held" a negotiable instrument here, they failed to present it for payment which is required under 13 Pa. 3501, and exemplified at federal UCC 3-501. The whole theory of "mortgage debt" is false, phony, bogus, unaccountable, impossible, and a **clog on the equity of redemption.**

12.   All claims for mortgage payments must stand on verified and notarized assignments, just as the original mortgage and lending contract were notarized and assigned. After years of this, nobody can yet show a valid Proof of Claim, offer anything except **fabricated and falsified hearsay** about completely bogus and fake "Accounts", cannot identify a secured interest, or even an unsecured interest, and refused to reveal the real party interest, because there is none.

13.    The effect of "monetization" and "securitization" works to eliminate the vestiges of an obsolete "debt-credit system", converting all interests into shares of **stock** equity. The undersigned absolutely denies his signature on any of the so-called "evidence" present within the "Proof of Claim", and absolutely denies any relationship (as did my wife in earlier pleadings) with this obscure and artificial "claimant". Strict proof to the contrary is demanded at trial by merit.

14.    Neither Jeffery Houser or his Wife Carol Houser ever "borrowed" money nor did any business even in privity to "Cascade Mortgage Funding Trust 2017-1", or "Specialized Loan Servicing LLC", neither of which we have ever heard of, nor did any such a creature or person make a demand or notice to pay at any time earlier. There is no "default" and nothing to cure.

15.    There are no facts alleged within the POC and if there are, these are denied after reasonable investigation, we are unable to ascertain the truth or falsity of

any "statements", except to say that all of it is 100% false, we did not sign anything, never got a loan of money or received any consideration for these fables, and have no idea what they are talking about.

## Verification

The foregoing is true, correct and complete within our 1st hand personal knowledge, information and belief. All statements of fact are made subject to the penalty for perjury under the laws of the United States, and the State of Pennsylvania. This verification constitutes our endorsement of the pleading.

JEFFERY HOUSER

5355 Monocacy Drive, Bethlehem Pa. 18017

*Jeffrey Houser    6/9/20*

CAROL ANN HOUSER

5355 Monocacy Drive, Bethlehem Pa. 18017

*Carol Ann Houser    6/9/20*

## Certificate of Mailing

The foregoing OBJECTION TO PROOF OF CLAIM were mailed 1st class to

Craig A. Edelman

Borial & Associates P.C.

P.O. Box 9013 Addison Texas, 75001

JEFFERY HOUSER

*Jeffry Houser*
*6/9/20*

4

6/7/2020                                        Northampton County

SIGN IN | CONTA

Home ▽        Property Records ▽        County Website

**Parcel**
**Owner**
**Multi-Owner**
**Residential**
**Commercial**
**Out Buildings**
**Land**
**Values**
**Homestead**
**Sales**
**Tax Information**
**Photos**
**Sketch**
**Map**

PARID: M5NW2 1 12 0508
HOUSER JEFFREY D & CAROL A,                        5355 MONOCACY DR

Parcel

| | 1 of 1 |
Return to Search Results

Actions
🖨 Printable Summary
🖨 Printable Version

Reports

Mailing List
PRC Report

Go

Links

Codes and Descriptions

Soil Codes and Descriptions

| | |
|---|---|
| Property Location | 5355 MONOCACY DR |
| Unit Desc | |
| Unit # | |
| City | |
| State | |
| Zip Code | |
| Neighborhood Valuation Code | 0802 |
| Trailer Description | |
| Municipality | EAST ALLEN TOWNSHIP |
| Classification | Residential |
| Land Use Code | 110 – Single Family, Residential |
| School District | NORTHAMPTON SCHOOL DIST |
| Topography | LEVEL |
| Utilities | PUBLIC WATER/SEPTIC APPROVED |
| Street/Road | SEMI-IMPROVED |
| Total Cards | 1 |
| Living Units | 1 |
| CAMA Acres | .4304 |
| Homestead /Farmstead | H – Homestead |
| Approved? | A – Approved |

Parcel Mailing Address

| | |
|---|---|
| In Care of | |
| Name(s) | HOUSER JEFFREY D & CAROL A |
| Mailing Address | 5355 MONOCACY DR |
| City, State, Zip Code | BETHLEHEM, PA, 18017-9111 |

Alternate Address

| | |
|---|---|
| Alternate Address | |
| City | |
| State | |
| Zip | |

ACT Flags

Act 319/515
LERTA
Act 43
Act 66
Act 4/149
KOZ
TIF Expiration Date
BID
Millage Freeze Date
Millage Freeze Rate
Veterans Exemption

Tax Collector

JOY HEMMING, TAX COLLECTOR
5344 NOR-BATH BLVD
NORTHAMPTON PA 18067

610-262-7961 EXT. 303

Assessor

KRISSA VISCOMI

6/7/2020

Northampton County

610-829-6171

Data Copyright Northampton County
**Last Updated**: 01/Jun/2020
Powered by iasWorld Public Access. All rights reserved.

6/7/2020

Northampton County

SIGN IN | CONT

Home ?        Property Records ?        County Website

| | |
|---|---|
| Parcel | **PARID: M5NW2 1 12 0508** |
| Owner | **HOUSER JEFFREY D & CAROL A,**                    5355 MONOCACY DR |
| Multi-Owner | |
| Residential | Values |
| Commercial | |

1 of 1
Return to Search Results

| | |
|---|---|
| Exempt Land | |
| Exempt Building | |
| Total Exempt Value | |

Actions

🖨 Printable Summary
🖨 Printable Version

| | |
|---|---|
| Current Land | $46,100 |
| Current Building | $78,700 |
| Current Total | $124,800 |

Reports

Mailing List
PRC Report

| | |
|---|---|
| Assessed Land | $23,100 |
| Assessed Building | $39,300 |
| Total Assessed Value | $62,400 |

Go

| | |
|---|---|
| Out Buildings | |
| Land | |
| Values | |
| Homestead | |
| Sales | |
| Tax Information | |
| Photos | |
| Sketch | |
| Map | |

Links

Codes and Descriptions

Soil Codes and Descriptions

Data Copyright Northampton County
**Last Updated**: 01/Jun/2020
Powered by iasWorld Public Access. All rights reserved.

November 9, 2010

## The Trustee's Role in Asset-Backed Securities
*—By the American Bankers Association, Corporate Trust Committee*

### Executive Summary

In this position paper, the Corporate Trust Committee is responding to current assertions that the obligations of trustees in asset-backed securities[1] ("ABS") are greater than the duties contractually undertaken by those trustees.

These assertions, which have been made by participants in the ABS market by investors, investment advisors, rating agencies and others[2], fail to recognize the legal limitations on the duties of ABS trustees and have been made in response to both disappointing ABS investment performance and market issues arising from the current economic crisis. Although ABS investment performance has been disappointing, particularly with respect to certain residential mortgage-backed securities, and there were numerous market issues which gave rise to the current crisis, it is the position of the Committee that the contractual role of the trustee was *not* a contributing factor to either the investment performance or the market issues which may have caused or affected it.[3] Moreover, in many instances, ambiguities or errors in the transaction documents governing impaired asset-backed securities have been construed in ways that were not contemplated or bargained for by the original transaction parties and that seek to alter the role and potential liability of trustees to a degree not warranted either by the contractual language or applicable statutory and common law.

As a basic principle, the Committee acknowledges the need for more clarity in transaction documents generally going forward. However, the Committee's position is that any issues that were neither contemplated by nor addressed in the documents governing current ABS transactions must be resolved in accordance with the legal contracts governing those transactions and generally accepted rules of contractual interpretation. Reliance on clear hindsight, even with the goal of protecting particular constituencies or investors generally, to impose duties retroactively on trustees that are clearly outside the range of duties undertaken in their contracts effectively abrogates those contracts and violates basic tenets of U.S. contract law.

---

[1] For purposes of this position paper, the term "ABS" will include residential and commercial mortgage-backed securities, collateralized debt and loan obligations and the securities issued by structured investment vehicles, by asset-backed commercial paper conduits and in other structured finance transactions backed by financial assets, whether involving fixed or revolving funding, static or dynamic collateral or funded or synthetic exposures,

[2] See, e.g., Moody's Investors Service, Inc., Structured Finance Special Report, "Moody's Re-examines Trustees' Roles in ABS and RMBS," February 4, 2003, and "White Paper on Reforming the Asset- Backed Securities Market," Association of Mortgage Investors, March 2010.

[3] See Fitch Ratings Ltd. Asset-Backed Securities Non-Rating Action Commentary, "Seller/Servicer Risk Trumps Trustee's Role in US ABS Transactions," February 24, 2003. ("Recently, ABS trustees have come under fire from some in the market who have suggested that performance issues for certain ABS transactions reflect failures by the trustees. Fitch Ratings believes this misses the mark. While the trustee can play an important role in an ABS deal, Fitch believes that unrealistic reliance on trustees increases the risk to investors by potentially masking other more important considerations when evaluating structured finance investments. Specifically, Fitch believes it is important to consider the critical role played by the seller/servicer in ABS transactions, which is heavily dependent on the stability of their business model and their financial viability. In addition, cash flow stresses should include appropriate servicing fee scenarios, and post-closing transaction performance and servicer financial health should be followed closely. Focusing of these key areas, in Fitch's view, is a more effective way for ABS investors to mitigate risk than any dramatic change in the trustee's role might provide.")

The first necessity for every debt security is certainty in its terms. For corporate and municipal debt securities this means clear drafting of the issuer's promise to pay. For asset-backed securities, this means clear drafting of the provisions which establish the trustee's security interest in the financial assets backing those securities and the provisions for converting payments due on the assets into payments to the related security holders. The duties performed by a trustee in connection with an issue of asset-backed securities (e.g., receiving data and collections from servicers, maintaining trust accounts, making calculations, remitting funds and distributing information) are integral to the terms of the asset-backed securities. Consequently, those duties should be explicitly set forth in the applicable transaction documents so as to establish clear expectations and avoid any misunderstanding of duties by investors or other interested parties. As transaction documents evolve to reflect enhanced roles for certain parties, (including trustees), as necessary to address emerging market issues, clear delineation of those roles and the attendant duties will be needed so that the terms of the new asset-backed securities will be unambiguous and not subject to misinterpretation.

This paper begins with an introduction of its authors, considers the historical development of the role of the indenture trustee and describes typical asset-backed securities transactions, including the parties who generally have the greatest knowledge of and control over the assets. It discusses in detail the limited role of the trustee in asset-backed securities transactions and how that role derives from the transaction documents. It further addresses mortgage loan servicing considerations within the context of the continuing issues in the mortgage market and misunderstandings by market participants of the limited role of ABS trustees.

## I. Introduction

The Corporate Trust Committee (the "Committee"), a committee of the American Bankers Association, focuses on the role of banks in providing corporate trust products and services to corporate, institutional and governmental clients. Its purposes include member education, providing a forum for their concerns and representing their interests. The Committee currently is composed of representatives of thirteen major banking institutions that provide corporate trust services, including acting as trustees for asset-backed securities. Together, these institutions provide trustee services for over 98 percent of all asset-backed securities.[4] The Committee believes that the views expressed herein reflect the views of virtually all trustees for asset-backed securities.

*Purpose of This Paper.* This paper is an update to a White Paper on the role of the trustee in asset-backed securities transactions which was issued by the Committee in 2003. The goal of the Committee is to update and set in proper perspective the trustee's role in relation to ABS transactions, particularly within the context of the significant market changes which have occurred over the last few years, and to address certain market perceptions concerning the trustee's role which diverge from the traditional understanding of the trustee's contractual, statutory and common law duties. This paper also explores in greater detail the role of the ABS trustee as "owner" or "assignee" of individual mortgage loans or other financial assets held by the trusts.

## II. Development of the Role of the Indenture Trustee

*Brief History.* The use of corporate trustees in the United States arose with railroad bonds in the nineteenth century. Extremely simple documents of a few pages developed over decades of use and litigation into long documents with extensive provisions that attempted to eliminate uncertainty as to

---

[4] Securities Industry and Financial Market Association data shows that approximately $2.4 trillion of ABS, including automobile, credit card, home equity, manufactured housing, student loans, equipment leases and CDO/CLO, was outstanding at the end of the first quarter 2010 and approximately $9.1 trillion of mortgage-backed securities, including agency (GNMA, FNMA, FHLMC, etc.), and other residential and commercial mortgage-backed securities, was outstanding at that time.

terms. Trustees accepted only ministerial duties for the convenience of the issuer, such as authenticating and paying bonds. At the time nearly all bonds were bearer bonds, so few records were needed. The terms of the bonds were largely contained in the bonds themselves. The terms "indenture" or "deed of trust" were applied to the documents pursuant to which bonds were issued because they generally followed a trust format: the issuer granted interests in property to the trustee to secure the issuer's obligation to repay the bonds. This style was adopted even where the debt was unsecured. The issuer's general obligation to repay the bonds was granted in trust to the trustee for the benefit of the bondholders.[5]

*Trust Indenture Act of 1939.* The first widespread test of corporate indentures came about with the Great Depression. Hearings in the 1930's by then SEC Commissioner William O. Douglas, among others, uncovered instances where a trustee's action or inaction resulted in harm to bondholders.[6] In the reforming spirit of the times, it was felt that public investors needed more protections than the market place had provided them.[7] As a consequence, the Trust Indenture Act of 1939 (the "Trust Indenture Act") was adopted.[8] It imposes on trustees subject to the Trust Indenture Act, regardless of any contractual protections, the requirement that, after a default with respect to the indenture securities, the trustee must protect the interests of the holders with the same degree of care that a "prudent man" would use with respect to his own interests.[9] Trustees could not be relieved from liability for their own negligence or willful misconduct.[10] Nevertheless, trustees would not be liable "except for the performance of such duties as are specifically set out in such indenture"[11] and could "conclusively rely . . . upon certificates or opinions conforming to the requirements of the indenture."[12]

The Trust Indenture Act is applicable to non-governmental debt publicly sold in the United States, but not other debt, such as privately placed securities.[13] Its provisions, which were required until 1990 to be quoted verbatim in the indentures to which it was applicable, form a core of boilerplate language that infuses indentures even where the Trust Indenture Act is inapplicable. Some state statutes, such as New York's Streit Act and various state Blue Sky laws, have inspired the addition of similar boilerplate language in indentures to which the Trust Indenture Act is not applicable. The prudent man standard of care established in section 315c of the Trust Indenture Act is the industry standard for trustees post default for corporate, municipal and structured finance debt issues. This standard has been in place for over 60 years and has served to guide the conduct of trustees in post default circumstances. That standard elevates the trustee's responsibilities to a more proactive role post default to use the same degree of care and skill in exercising its rights as a prudent person would, under the particular circumstances, in order to enforce obligations and pursue remedies on behalf of the bondholders as provided for in the trust documents. In certain private placements, the trustee may be more limited in its activities due to the required direction of private investors who wish to exert a higher degree of control and as reflected in the specific trust documents. Such limitation of the prudent man standard is not the prevailing model for the majority of structured finance transactions.

*Model Debenture Indenture.* In 1971, the American Bar Foundation published the Commentaries on Indentures (the "Commentaries"). It resulted from a long-term American Bar Association committee project representing issuers, underwriters, trustees and governmental interests. The Commentaries contained a model indenture derived from a long evolution in standardized indenture documentation that

---

[5] Smith, Chase and Morison, "The Trust Indenture Act of 1939 Needs No Conflict of Interest Revision," 35 The Business Lawyer 161, 163-63 (1979). See generally American Bar Foundation, Commentaries on Indentures 4-10 (1971).

[6] Hearings Before Subcommittee of the Committee on Interstate and Foreign Commerce, House of Reps., 75th Cong., 3rd Sess., on HR 10292, April 25, 1938, at 30 *et seq.* (remarks of Commissioner Douglas concerning, among other things, hearings in which he had previously participated).

[7] See TIA (defined in note 6 *supra*), Section 302.

[8] Act of August 3, 1939, 53 Stat.1149, 15 USC Sections 77aaa-77bbbb, as amended (the "TIA").

[9] TIA, Section 315(c).

[10] TIA, Section 315(d).

[11] TIA, Section 315(a)(1).

[12] TIA, Section 315(a)(2).

[13] TIA, Section 304(b).

had become the prevailing influence on indenture drafting long before its publication. Among many other provisions, the model indenture contained in the Commentaries included standard provisions on the rights, duties, obligations and immunities of the trustee. These provisions were carefully crafted to provide the trustee with the protections customary in the financial marketplace without violating the Trust Indenture Act. They limited the duties of the trustee to those expressly stated (until default when the statutory prudent man standard became applicable), exonerated the trustee for all but its negligence or bad faith, provided for reliance by the trustee on various issuer and expert certifications and provided other protections. These standard provisions appear in hundreds of thousands of indentures and similar instruments, including the documents relating to asset-backed securities transactions.

*The Reform Act.* The Trust Indenture Reform Act of 1990 (the "Reform Act")[14] remains the only substantive amendment to the Trust Indenture Act. The Reform Act, among other things, changed the time when a trustee's conflicting interests are judged for purposes of disqualification of the trustee. Under the pre-1990 Trust Indenture Act, the existence of any of nine specified "conflicting interests" at any time while indenture debt was outstanding required cure or resignation by the trustee. After the Reform Act, a "conflicting interest" exists only when default under the indenture is pending and one of the specified conflicts also exists. The SEC proposed and Congress enacted this change because they believed that a trustee's pre-default role is only administrative.[15] This change made disqualifying trustee conflicts applicable to a trustee at substantially the same time as the prudent man standard becomes applicable to the trustee. It implicitly recognizes that, before any default occurs under an indenture, a trustee has no duties under the indenture other than the duties it has explicitly undertaken to perform.

*The Trustee.* The virtually universal inclusion in indentures of standard provisions protecting and exonerating the trustee reflects the economic realities of trustees' relationships to debt offerings. Trustees are usually named late in the preparation of a transaction (with accordingly limited ability to negotiate terms) and are paid relatively small fees to act as trustees in transactions involving large sums of money. A trustee's willingness to act is premised upon its documented understanding that the trustee can have no liability in the transaction except for its own negligence or willful misconduct in carrying out its prescribed duties or for breach of contract claims. Thus, trustees require indemnification and a lien against trust assets for their expenses in enforcing the indenture and defending themselves against claims.

## III. Asset-Backed Securities Transactions

*Brief History.* Current asset-backed securities transactions (as distinguished from traditional mortgage indentures that granted physical security under mortgages mostly for railroads and utilities) developed in the 1980's from such predecessors as project finance, sale-leaseback and tax-exempt municipal financing. The initial draftsmen were experienced with traditional indentures for corporate and municipal debt and the passive roles performed by trustees under those indentures prior to any default. However, certain structural features of asset-backed securities transactions, primarily the absence in most such transactions of an operating issuer, inclined the draftsmen to make the trustee's pre-default role more active.

*Structure.* In a typical asset-backed securities transaction, a seller transfers receivables, securities or other assets in either of two ways. A trustee may receive the assets in exchange for pass-through certificates evidencing beneficial ownership interests in such assets. Alternatively, a Delaware statutory trust or another limited purpose entity (a "special purpose vehicle" or "SPV") organized by the sponsor of the ABS transaction[16] may purchase the assets with proceeds from its notes or other debt

---

[14] Act of November 15, 1990, Pub. L. 101-550, 104 Stat. 2713.

[15] Senate Report 101-155, The Securities Acts Amendments of 1989, October 18, 1989, at 32-35 ("[T]he Commission has stated that, in the absence of default, the indenture trustee's duties are essentially ministerial . . . ." at 32).

[16] Regulation AB (see *infra* at footnote [17]) defines "sponsor" as the person who organizes and initiates an asset-backed securities transaction. This person may be the seller.

instruments and pledge such assets to a trustee to secure the debt instruments. The seller of the assets or the SPV may sell the certificates or debt instruments directly or through underwriters to investors. A pooling and servicing agreement, trust indenture or similar agreement forms the basic document which sets forth the relationship among the parties and the assets.

*Sellers.* In most asset-backed securities transactions, the seller (or originator, depositor or other sponsor) assembles the pool of financial assets backing the securities by purchasing them or arranging for them to be acquired. The seller then describes the financial assets in offering materials and sells the securities backed by them to investors. The seller, in conjunction with underwriters or private investors, determines the structure, drafts the documents and prices the transaction. The seller selects the other transaction participants, including the underwriter, if any, the servicer and the trustee. It may also sell the securities to investors and it, or an affiliate, may act as servicer. At the initiation of an asset-backed securities transaction, the seller will know more about the assets and structure of the transaction than any other participant. In some cases the seller will have continuing obligations with respect to the pool of assets, such as an obligation to add or replace assets if the assets in the pool drop below certain value thresholds. In other cases the seller will have no contact with the pool of assets once the transaction is closed. The seller may benefit from the initial sale of the assets to the trust or SPV and from the sale of securities issued by the trust or SPV to investors, as well as from any ongoing relationships that the seller or its affiliates may have with the transaction.

*Underwriters.* The seller may select one or more underwriters to purchase the asset-backed securities and resell them to investors. Underwriters, their counsel and other experts conduct a "due diligence" review of the assets, the structure of the transaction and the parties involved to obtain comfort and protection under the securities laws that the prospectus or other sales document is accurate. In some cases the underwriter controls the seller of the assets and is primarily responsible for the structure and assets in the transaction. Underwriters sell the securities and then have no further relation to the transaction. Consequently, they have little interaction with trustees.

*Servicers.* The servicer is appointed as an independent contractor who performs its servicing obligations for the benefit of the transaction investors. Servicer duties are specified in the applicable servicing agreement and generally are performed in accordance with certain accepted servicing practices (as defined under the agreement). In connection with these duties, the servicer's fee is typically structured as a percentage of the outstanding balance of the asset pool. Servicing duties are carried out either directly or through subservicers, and involves managing the underlying assets deposited with the trust or SPV in the asset-backed securities transaction.

The servicer typically collects all the income from the assets, enforces the assets as needed and may perform any evaluations needed to substitute assets. Following the end of each collection period, as defined in the ABS transaction documents, the servicer reports to security holders (often through the trustee) information on collections and other summary information about how the assets are performing. This information is used to determine the payment stream to holders of ABS and the allocation of losses, if any. The servicer may also determine allocations of funds to reserves and/or to purchase additional assets. The trustee applies the funds delivered to it from the servicer, as instructed by the servicer and provided in the transaction documents, to pay interest and principal on the securities, to fund reserve accounts and purchases of additional assets, and to make other payments including fees due to the ABS transaction participants.

Additionally, as required by recent federal legislation, servicers evaluate and approve mortgage loan modifications, short sales and other default resolution strategies to mitigate losses in connection with defaulted assets. To the extent enforcement of the assets involves a foreclosure action, the servicer undertakes these actions in the trustee's name as the secured party but is fully responsible for all associated activities including the engagement of counsel, eviction proceedings, property maintenance, and sale or disposition of properties following foreclosure.

Thus, in most asset-backed securities transactions, the seller and the servicer have more knowledge about and, in the case of the servicer, control over the assets, asset performance and the

transaction generally than any other transaction participant. In many asset-backed securities transactions, the document may not contemplate any direct check on the performance of the seller or the servicer. Transaction documents virtually *never* give the trustee any substantive oversight of the seller or the servicer and their activities other than to confirm the timely receipt by the trustee of certain remittances and reports from the servicer, including reports of independent accountants, and certifications in the forms required by the transaction documents. Additional oversight is not explicitly required of trustees and would necessarily be limited to matters that are readily ascertainable and verifiable on a cost and time sensitive basis. Importantly, the trustee typically has no duty under the transaction documents to make investigations on its own for the purpose of detecting defaults, fraud or other breaches.

If the servicer becomes insolvent or unable to perform, the trustee may be responsible under the transaction documents for the appointment of a successor servicer. Some transaction documents contain specific provisions relating to "back-up" servicing, *i.e.*, appointing a specified successor servicer from the outset to take over servicing when succession becomes necessary. These provisions range from "cold" back-up servicing, where the trustee agrees in the transaction documents to become the successor servicer (a servicer of last resort) unless another entity (appointed by the trustee when needed) accepts such appointment, to "hot" back-up servicing, where a successor servicer named in the transaction documents agrees to maintain back-up files throughout the transaction. In transactions where the trustee accepts the role of back-up servicer, the trustee typically relies upon arrangements with servicing units within its own institution or with third party providers to pre-arrange succession.

*Trustees.* The trustee in an asset-backed securities transaction may perform various functions, including serving as indenture trustee, authenticating agent, issuing and paying agent, securities registrar and transfer agent and calculation agent with respect to the securities, custodian of the assets (on behalf of the issuer), analytics provider and back-up servicer. "Trustee" as used herein, unless otherwise specified, includes all such roles performed by the trustee in an asset-backed securities transaction (but not the role of servicer, back-up servicer or master servicer).

The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions. The asset-backed securities trustee's ability to accept these expanded duties within its role and compensation depends on the clear expression of such duties in the transaction documents and the applicability of the provisions thereof to properly limit the trustee's liability for their performance.

## IV. Regulation of Asset-Backed Securities

*Regulation AB.* In December 2004, the Securities and Exchange Commission ("SEC") published comprehensive final regulations addressing registration, disclosure and reporting requirements for asset-backed securities.[16] Among other things, the regulations require specific disclosure regarding ABS transaction counterparties in transactions registered with the SEC, including trustees, sponsors, depositors, issuing entities, servicers, originators and others. Consistent with the economic reality of the trustee's role as being ministerial in nature, the regulations require only basic, limited, summary disclosure regarding the trustee. Indeed, the SEC did not even propose a separate definition of "trustee," and following market commentary did not believe such a definition was necessary.

The limited disclosure for trustees stands in marked contrast to the *increased* disclosure that the regulations require for many other ABS transaction participants, including sponsors, issuing entities, servicers and related parties. It also stands in particularly sharp contrast to the regulations' *new and materially higher* disclosure standards for significant obligors, credit enhancement providers and swap counterparties in ABS transactions due to the critical importance of these parties – as contrasted to the trustee – to the economic performance of transactions subject to the rule.

---

[16] *See* Securities Act Rel. No. 8518 (Dec. 22, 2004), available on the Internet at http://sec.gov/rules/final/33-8518fr.pdf.

At this writing, the SEC has proposed revisions to both Regulation AB and asset-backed securities generally  that would impose substantial changes in the offering process and disclosure and reporting requirements for ABS (the "Proposal").[17]  In a lengthy release that emphasizes the need for improved investor protection in the wake of the financial crisis, the SEC issued the Proposal because "[t]he recent financial crisis highlighted that investors and other participants in the securitization market did not have the necessary tools to be able to fully understand the risk underlying those securities and did not value those securities properly or accurately."  However, even though the Proposal is a direct result of the financial crisis and it substantially increases disclosure concerning pool assets, servicers, originators, cash flow models, repurchase demands, and other items, the Proposal requires no additional disclosure concerning trustees

## V.  The Asset-Backed Securities Trustee

*Transaction Documents.*  The principal document in most asset-backed securities transactions is a pooling and servicing agreement, indenture or similar contract governing the securities pursuant to which the securities are issued and the trustee serves. The transaction documents normally provide for events of servicer default, additional events of default ("acceleration events" in pooling and servicing agreements), and limits on enforcement rights only to rights against the assets dedicated to the asset-backed securities transaction (not against the seller) or performance obligations of contractual parties. Additional agreements may detail the roles of the servicer and other parties and may contain specified additional duties for the trustee.

The responsibilities of the trustee, as set forth in typical asset-backed securities transaction documents, whether a pooling and servicing agreement or an indenture, are narrowly circumscribed as to each role and are traditionally stated to be limited to those expressly accepted by the trustee.  These duties are ministerial in nature and do not require the trustee to verify, investigate or monitor the actions of the seller or the servicer (other than in instances of a breach or a default as further described below). Lastly, in tacit recognition that the trustee's duties are so circumscribed, asset-backed securities transaction documents usually provide for expert input from independent accountants or others in circumstances where information needs to be audited or verified and actions at the direction of specified requisite percentage of holders (contingent upon providing trustees with indemnity sufficient to cover such actions contemplated).  Trustees are virtually never required or invited to exercise independent discretion in the transaction documents.

Under Trust Indenture Act-qualified transaction documents, during the continuance of a default, the trustee must exercise its rights and powers under the transaction documents for the benefit of the holders of the asset-backed securities in the same manner that a prudent person would exercise such rights and powers for his or her own benefit.  Lastly, these provisions are generally only relevant to the extent the trustee has actual knowledge of a default (or a breach which, to the extent not cured, will mature into an event of default) and specific actions or remedies are clearly prescribed under the transaction documents.

*Basic Duties of the Trustee.*  In most asset-backed securities transactions, the roles and basic duties of the trustee are specifically detailed in the transaction documents and may consist of the duties for the following capacities.

1.  As *assets custodian*, the receipt, safekeeping and release of the assets;

2.  As *analytics provider*, the performance of certain, specified analysis and reporting of related data provided thereto;

---

[17] The proposing release is available at http://www.sec.gov/rules/proposed/2010/33-9117.pdf.

3. As *account custodian*, the receipt, maintenance and segregation of funds derived from the asset;

4. As *paying agent*, the release of those funds as payments to holders and for other purposes; and

5. As *trustee*, the holding of a lien on the assets for the benefit of holders, the circulation of certain information to holders, the exercise of certain remedies for the benefit of investors as specified and/or directed by a controlling majority and the replacement of the servicer.

Additionally, the trustee performs certain traditional duties in respect of the asset-backed securities (authenticating agent, registrar and transfer agent for the asset-backed securities issued under the indenture or pooling and servicing agreement). Although some of these tasks may be complex, they are all ministerial in nature and not discretionary. Trustees accept these duties in reliance upon provisions in transaction documents that limit trustee performance liability to negligence and bad faith, authorize trustee reliance on the servicer for all information and indemnify the trustee.

*Asset Custodian.* The trustee usually is granted a security interest in or is the owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities. The details of the interest and the trustee's duties in respect of it are described in the transaction documents. The actual grant occurs pursuant to the transaction documents at the closing for the issuance of the asset-backed securities. In the case of physical assets or securities, the transaction documents usually require that physical possession be given to the trustee or registration of securities be made in the name of the trustee or its nominee. Where the assets are receivables, inventory or other property that may be impracticable for the trustee to hold, the transaction documents normally specify that the trustee's interest in such assets must be clearly indicated in the records of the seller or pledgor of the assets. The quality of the security interest granted ("perfected", "first priority", etc.) and the "true sale" nature of any transfer of assets may be specified in the transaction documentation. The trustee is not, however, expected to determine that a security interest of such quality has been established or that a "true sale" transfer has occurred. Instead, the trustee is authorized by the transaction documents to rely upon legal opinions or other evidence to establish at closing that what it has been granted conforms to the documents. The trustee is also authorized to rely on future opinions and instructions from others (usually the servicer or the seller) to establish that the assets are being maintained so as to preserve the trustee's interests in the assets in accordance with the transaction documents.

The trustee may be obligated under the transaction documents to determine from time to time that the aggregate value of the assets bears a prescribed ratio to the amount of the debt outstanding or to perform other analytics on the assets. The documents set forth precise valuation procedures and indices and other methods of valuation and authorize the trustee to rely upon specific sources of information. The trustee will instruct the seller or other responsible party to add assets if needed or may permit assets to be withdrawn if the amount held exceeds requirements. In each case the trustee has authority to rely on specified information as to the value and ownership of assets being added or withdrawn. The trustee may also require the substitution of new conforming assets for existing assets that have ceased to conform to the asset requirements for the transaction upon receiving notice of such failure to conform. Usually the seller or servicer will effect the substitution. The trustee will be authorized to rely upon their representations that the substitute assets meet transaction requirements. In certain transactions there is a constant or periodic flow of assets through the trustee's custody or security interest.

*Accounts.* The transaction documents usually specify a number of separate accounts in which the trustee is instructed to hold funds derived from specified sources. The servicer usually collects the funds from these sources and remits the funds to the trustee with instructions as to source and account application. Appropriately, in most asset-backed securities transactions, the trustee is authorized under the transaction documents to rely entirely upon the servicer as to the source and, usually, the allocation of the funds to particular accounts because the trustee has no independent means to investigate the servicer's information and instructions. The trustee's only duty is to keep the funds safe until their release is directed pursuant to the transaction documents by the servicer or upon the happening of an event, established by certification to the trustee.

Page 8 of 12

*Payments.* The trustee for an asset-backed securities transaction releases funds from one or more accounts upon the terms of the transaction documents to pay holders, to pay transaction participants' fees and expenses and, in some cases, to pay the costs of acquiring new assets. The trustee or the servicer usually calculates payments to holders based upon the terms of the asset-backed securities. Often an asset-backed securities transaction involves several classes of holders who are entitled to payment at different levels of priority, with some entitled to payment on a particular day only if the funds then available exceed the amounts due to others having more senior interests. If the calculation requires information not known to the trustee, the transaction documents specify that in making the payment the trustee may rely upon information provided by other transaction participants.

*Reports.* The trustee usually provides monthly distribution reports to holders of securities, furnishes information or documents pertaining to the assets and performs tax reporting functions on distributions. In addition, in the case of publicly offered transactions, the trustee may file the periodic reports required by the Securities Exchange Act of 1934[17] on behalf of the trust, the SPV, the servicer or the seller.

*Replacement of the Servicer.* The transaction documents often make the trustee responsible for any needed succession of another entity to the role of servicer. The transaction documents usually provide precise circumstances when the trustee must remove the servicer, such as upon the servicer's bankruptcy or material breach of its covenants. Where the transaction documents task the trustee with the administration of servicer performance standards, most trustees require that such standards be set forth in a sufficiently clear manner that the trustee may reasonably administer them.

In cases where the transaction participants or rating agencies contemplate a higher risk of replacing the initial servicer, a designated back-up servicer is appointed at the initial closing of the transaction. The requirements of any such designated backup servicer vary depending on the servicer, transaction structure, asset class and other variables. In some instances the backup servicer will maintain redundant real time servicing information during the life of the transaction so that it is in a position to step in at any time. In other instances, backup servicers may only periodically receive and test back-up tapes of transaction information. The specific responsibilities of the backup servicer vary and are clearly outlined in the applicable servicing agreement.

While designated backup servicers are appointed on more transactions today than they have been historically, in many transactions servicer succession is not actively contemplated at closing. In such cases, the transaction documents provide that the trustee will appoint a successor servicer, if needed, or will act as the successor servicer itself until another entity accepts appointment. This arrangement is typically referred to as having the trustee act as the "servicer of last resort."

Trustees that do not wish to perform as successor servicer, following the termination of the initial servicer, may obtain an agreement from another entity that can and is qualified to act for them in order to take over servicing upon the trustee's request. This type of succession arrangement can function reasonably well when funds are set aside for transition expenses and the successor servicers' fees are adequate, or can be increased, to attract a successor servicer.

*Satisfaction and Discharge.* Trustees are required to confirm that the discharge of indentures upon the stated maturity of the securities issued thereunder or upon the delivery to the trustee of all such securities for cancellation complies with the requirements under the transaction documents. In connection with the discharge of an indenture, the trustee ensures it receives the appropriate officers' certificates from the issuer (and, if applicable, the co-issuer) and an opinion of counsel, each stating that all conditions precedent for the satisfaction and discharge of the indenture have been satisfied. Although the provisions governing satisfaction and discharge of indentures have remained very consistent over time, trustees have recently come under pressure to discharge indentures in cases where the collateral securing the bonds has been exhausted or liquidated before the stated maturity of the bonds, which remain outstanding.

---

[17] Act of June 6, 1934, 48 Stat. 881, 15 USC Sections 78a-78jj, as amended.

## VI.  Trustee as "Owner" or "Assignee" of Mortgage Loans

Mortgaged-backed securities ("MBS") often use pooling and servicing agreements, pursuant to which an MBS trustee holds formal title to loans for the benefit of MBS investors, calculates and processes securities payments, and takes certain specific actions on behalf of investors.  Although the trustee is the legal owner of record of the mortgage loans, the trustee does not own the loans for its own account or have an economic interest in the loans.  The beneficial owners of these mortgage loans are investors in the MBS securities, who typically are large institutions such as public and private pension funds, mutual funds and insurance companies.

As is the case with all other ABS, the role of the securitization trustees in MBS transactions is limited.  The trust instruments creating MBS securities and relevant law do not give the trustee any powers or duties with respect to foreclosure, maintenance, sale or disposition of properties that are collateral for the MBS securities.  Those powers and duties are conferred exclusively on loan servicers, who generally are appointed by the depositor or seller of the loans to the MBS trust.  In fact, depending on the particular trust and pool, the trustee may have no or very limited information on either the borrower or the status of the mortgage loan.  While foreclosure and any legal action with respect to trust properties must be brought in the trustee's name as the legal owner of the loans, foreclosure activity and the post-maintenance, sale and disposition of the trust properties are managed entirely by the loan servicers.  Although any claims against the trust must be brought against the trustee as the trust's legal representative,   these cases usually are defended either by the original lender who sold the loans to the securitization trust or by the loan servicer.  Occasionally, trustees will become actively involved in this type of litigation in a representative capacity to protect the interests of the investors who are beneficiaries of the securitization trusts.

As previously discussed, the servicer is an independent contractor and is fully responsible and liable to the investors in connection with the performance of all loan servicing obligations as outlined in the applicable transaction documents.  Trustees are not responsible for overseeing or monitoring the performance of the servicer other than with respect to confirming its timely receipt of remittances or any periodic reports or certificates in the required form.  To enable servicers to independently perform their servicing obligations, trustees are generally required to provide powers of attorney to the servicer and execute documents as requested or directed by the servicers in furtherance of any loan servicing activities.  In the event a servicer fails to perform its obligations, and such ongoing failure constitutes a servicer event of default, trustees may take additional action to pursue remedies on behalf of or as directed by the investors.  Absent a servicer default, the trustee has no authority to direct or approve loan servicing activities.

## VII.  Response to Assertions of Market Participants on Role of the Trustee

Contrary to recent suggestions,[19] the trustee in an asset-backed securities transaction is not like the board of directors of a company and does not owe ABS investors fiduciary duties similar to those owed by such directors.  Prior to a default, the trustee's duties are limited to those expressly set forth in the related pooling and servicing agreement, indenture or similar contract.[20]  The court in the case, *In re*

---

[19] See "White Paper on Reforming the Asset-Backed Securities Market," Association of Mortgage Investors, March 2010.
[20] See, e.g., Trust Indenture Act (TIA), § 315(a)(1), 15 U.S.C. § 77ooo(a)(1); the Commentaries § 6-1, at 248 ("Before the occurrence of an event of default, Subsection (a) [of section 315 of the TIA] requires the Trustee to perform only those duties that are specifically set forth in the indenture."); and J. Spiotto, Defaulted Securities: The Prudent Indenture Trustee's Guide, at IV-13 (1990).

*E.F. Hutton Southwest Properties II v. Union Planters,*[21] stated that "the corporate trustee has very little in common with the ordinary trustee. . . .  The trustee under a corporate indenture . . . has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.  His status is more that of a stakeholder than one of a trustee" (quotation marks omitted).[22]  New York courts have held that New York common law governing trust indentures is consistent with the foregoing interpretations of the TIA,[23] and federal courts applying New York law have ruled similarly.[24]  The court in the case, *Semi-Tech Litigation, LLC v. Bankers Trust Co.,*[25] for instance, stated that, "[u]nder New York law, the pre-default duties of an indenture trustee . . . generally are limited to the duties imposed by the indenture. After an event of default, the trustee is held to the prudent man standard" (citations and quotation marks omitted).[26]

Occasionally, the duty of an asset-backed securities trustee to take or refrain from taking a particular action is unclear, either because the related asset-backed securities documents are vague regarding the action to be taken or who is to take the action or because the permissibility of the action is in doubt under the terms of the documents (or for some other reason).  In many recent instances, such ambiguities have prompted trustees to interplead participants in collateralized debt obligation and other asset-backed securities transactions as to which disputes have arisen, or, where the allocation of deal assets was not contested, to file for declaratory judgment. Trustees also have been concerned about their duty and ability to accept and cancel securities gratuitously surrendered by collateralized loan obligation investors for the purpose of affecting the timing and amounts of payments on other securities comprising part of the same issuance.[27]  Additionally, trustees have been concerned about their duty and ability to cooperate in residential mortgage loan modifications under the Home Affordable Modification Program ("HAMP") established by the Secretary of the United States Treasury pursuant to the Emergency Economic Stabilization Act[28] and to treat principal forborne on those mortgage loans or reduced in amount pursuant to HAMP as a realized loss under the related asset-backed securities transaction documents.[29]

Ambiguities or gaps in ABS transaction documents have, as described in Part III above, prompted transaction participants to induce trustees to undertake duties traditionally carried out by other parties, such as servicers. In most if not all such transactions, trustees are neither appropriately compensated for doing so, nor required to acquiesce under the terms of the contract. More importantly, in contrast to other transaction parties, trustees (within their trust departments) generally do not have (nor should be presumed to have) the expertise to make substantive business decisions. Rating agencies and investors should consider alternative means of mitigating the potential for servicer mistake or malfeasance, including the appointment of a backup servicer, a credit risk manager or verification agent.[18]

Although it would not be possible to resolve any uncertainty by interpreting the transaction documents to contain terms beyond the plain meaning of their existing provisions, trustees may determine the appropriate course of action in reliance upon the standard provisions protecting and exonerating them and the principle, established in the cases discussed in  the immediately preceding paragraph and in other cases along similar lines, that the trustee's duties are limited to those expressly set forth in the transaction documents prior to a default.

[21] 953 F.2d 963 (5th Cir. 1992).
[22] Id at 969.
[23] See *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,* 11 N.Y.3d 146 (2008).
[24] *Elliott Associates v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71 (2d Cir. 1988).
[25] 353 F. Supp. 2d 460 (S.D.N.Y. 2005).
[26] Id at 472.
[27] Moody's Investors Service, Inc. Structured Finance Special Report, "Challenges in Interpreting CDO Documentation: A Summary of Moody's Observations and Responses from 2009," Part II (Note Cancellations in CLO Transactions), pp. 2 - 3, March 2010.
[28] Pub. L. 110-343.
[29] See Letter of American Securitization Forum to Michael S. Barr, Acting Under Secretary for Domestic Finance and Assistant Secretary of the United States Department of the Treasury, dated December 19, 2009.
[18] See **The Report**—*Another View* infra.

## VIII. Conclusion

Trustees provide important services to the asset-backed securities marketplace under the terms of the applicable transaction documents. These duties are ministerial in nature and scope which is consistent with the limited information given to trustees and the level of compensation paid to trustees for those services. Parties in the marketplace generally have accepted the scope of the trustee's role since the enactment of the Trust Indenture Act, as evidenced by consistent terms in the relevant agreements over the last 70 years. The limited role of the trustee has not, in fact, been a contributing factor to disappointing ABS investment performance and was not a contributing factor in the current financial crisis.

Accordingly, efforts to expand the interpretation of transaction documents to retroactively impose additional non-contractual duties on trustees in light of the financial crisis are misguided. Indeed, such efforts, which may be seen as substantially altering the scope of the trustee banks' role and the extent of their potential liability relative to the holders of ABS, are not legally enforceable and would constitute unsafe and unsound practices for the banking industry. Absent trustees' consent, the reinterpretation of contractual terms to impose on trustees duties not contemplated at the inception of an ABS transaction is financially unfair to trustees, legally indefensible as an abrogation of their right of contract and destructive to the necessary certainty of debt terms that underlies successful capital markets.



**U.S. BANK GLOBAL CORPORATE TRUST SERVICES**

Reports on the foreclosure challenges facing our country continue. There remains heightened interest and involvement from borrowers, elected officials, financial institutions and community organizations on the role of the trustee.

## PLAINTIFF DENIES IT'S OWN LAWSUIT!!

# Role of the Corporate Trustee

## Financial strength. Local expertise. Global reach.

It is estimated that some mortgage lenders securitized as much as 70-80% of their outstanding mortgages through the sale of Mortgage Backed Securities (MBS) in the capital markets. This process, the securitization of mortgage loans, goes back to the 1970s and has contributed to the availability and affordability of mortgage credit.

The combination of high foreclosure rates and high levels of mortgage backed securitization activity has many people attempting to understand the complex securitization process and identify the parties to the MBS transactions and their assigned responsibilities.

### Distinct Party Roles

Parties involved in a MBS transaction include the borrower, the originator, the servicer and the trustee, each with their own distinct roles, responsibilities and limitations.

The Trust Indenture Act of 1939 prohibit bond issues valued at over $5 million from being offered for sale without a formal written agreement (an indenture) signed by both the bond issuer and the bondholder, that fully discloses the particulars of the bond issue. The act also requires that a trustee be appointed for all bond issues, so that the rights of bondholders are not compromised.

Reference of Trust Indenture Act of 19...



## U.S. Bank as Trustee:

As Trustee, U.S. Bank Global Corporate Trust Services performs the following responsibilities:

- Holds an interest in the mortgage loans for the benefit of investors
- Maintains investors/securities holder records
- Collects payments from the Servicer
- Distributes payments to the investors/ securities holder
- Does not initiate, nor has any discretion or authority in the foreclosure process
- Does not have responsibility for overseeing mortgage servicers
- Does not mediate between the servicer(s) and investors in securitization deals
- Does not manage or maintain properties in foreclosure
- Is not responsible for the approval of any loan modifications

All trustees for MBS transactions, including U.S. Bank, have no advance knowledge of when a mortgage loan has defaulted.

Trustees on MBS transactions, while named on the mortgage and on legal foreclosure documents, are not involved in the foreclosure process.

# What is a Mortgage Backed Security?

Residential and commercial property mortgages often are used to create Mortgage Backed Securit (MBS) by firms within the financial industry. Mortgage backed securities are financial instrume which represent an ownership in a group of mortgage loans, commonly referred to as pools, and th corresponding cash flows. Mortgage loans are purchased from banks, mortgage companies, and oti originators and then assembled into pools by a governmental, quasi-governmental, or private en and then deposited into trusts which issue securities entitling the investors to all principal and inter payments made by borrowers on the loans in the pool. This process is known as securitization.

MBS securities are brought to market by the owner of a pool of mortgages, typically referred to as the sponsor, and the transaction is structured and sold by investment bankers. A sponsor may be the originator of the mortgages or, in many circumstances, an aggregator who both originates and purchases mortgage loans from smaller originating institutions. When a pool of sufficient size and diversification has been aggregated, the sponsor will engage the appropriate parties to structure, sell and administer the mortgage loans and trust on an ongoing basis.



# Who initiates and Manages a Foreclosure?

U.S. Bank, as trustee for thousands of securitization transactions involving many millions of mortgage is often mentioned in media reports about foreclosures. While trustees are listed on mortgages, a therefore in legal documents as well, as the owner of record, its interest is solely for the benefit investors. The trustee does not have an economic or beneficial interest in the loans and has no author to manage or otherwise take action on the loans which is reserved for the servicer.

As noted, the trustee does not play a role in initiating or managing a foreclosure process a consequently has little, if any, information relating to mortgage loan activities including a foreclosu Depending on the particular trust and pool, the trustee may have very limited information on either t borrower or the property.

The servicer, who is selected by the Sponsor of the trust, may have to foreclose on a property i borrower (mortgagee) does not make payments as required by the mortgage documents. Any acti taken by the servicer must maximize the return on the investment made by the "beneficial owners the trust" -- the investors.

## Servicer vs Trustee Responsibilities

Appointed by the sponsor, the Servicer is the contractual party to the trust for the benefit of investors, and performs the following responsibilities:

- Collects payments from the borrower/mortgagee
- Maintains loan level detail
- Pays property taxes and insurance (if applicable)
- Calls a default for non-payment
- Forecloses on the mortgage and maintains the related property
- Modifies mortgage terms within limitations outlined by the provisions of the Pooling and Servicing Agreement relevant to a particular MBS transaction
- Maintains the physical property to comply with local housing codes



U.S. Bank Global Corporate Trust Services, as Trustee, is responsible and accountable to the investors or holders of the securities that the mortgages are pledged against as collateral for the duties set forth in the contracts governing the transaction. These duties are carefully detailed in the contracts and are limited to the responsibilities specifically accepted by the trustee.

## How Do I Obtain Information on a Specific Mortgage Loan?

To learn more about a foreclosed property, contact the servicer for the MBS transaction that holds the mortgage as collateral. The most effective way to identify the servicer for a specific mortgage is to ask the borrower (homeowner) who they make their monthly payment to or from whom they receive their monthly statements. The firm receiving the payments and sending statements is generally the servicer for the MBS transaction and can offer more details regarding a foreclosed property.

To ensure clarity of the various participants related to a foreclosure process with MBS transactions, U.S. Bank has taken two important actions. U.S. Bank has sent notices to servicers with whom they work on MBS transactions to reinforce the importance of properly identifying U.S. Bank as Trustee for the specific trust in all foreclosure actions and filings, complying with industry servicing practices and maintaining any foreclosures in accordance with applicable laws. Secondly, U.S. Bank established a dedicated toll-free (800) number to handle calls related to loans which identify U.S. Bank as Trustee. Our professional staff explains to callers the role of U.S. Bank as Trustee and also provides the information callers need to connect with the servicer who can best address their questions.

For more information about U.S. Bank and our role as trustee in MBS transactions, please call (800) 236-3488 between the hours of 8 a.m. and 5 p.m. central standard time Monday through Friday.

## Why not modify mortgage loans in default?

Borrowers agree, under the terms of mortgage and note, that upon a payr default the lender or owner has the righ assume ownership of the property. Whe the servicer pursues a foreclosure or consi a modification of the loan, the goal is sti maximize the return to investors. Considera of any loan modification is predicated on whe the trust documents allow modifications, underwriting criteria applicable to the partic borrower's circumstances, and federal state laws concerning loan modifications.

Regardless, the servicer is fully empowe to enter into modifications with borrowers long as such actions comply with indu servicing practices, is allowed under the t documents, maximizes the return to inves and complies with relevant laws.



**Additional Sources of Information:**
- American Bankers Association White Paper, The Trustee's Role in Asset-Backed Securities, dated November 9, 2010 (http://www.aba.com/Press+Room/110910RoleofATrustee.htm)
- The Trust Indenture Act of 1939

# Parties to a Mortgage Backed Securities Transaction

### Borrower

The person or entity responsible for the mortgage note and making principal and interest payments in accordance with the underlying mortgage documents.

### Investment Bank/Sponsor

Responsible for structuring the MBS transaction and selling the securities to investors.

### Investor

The buyer and owner of an MBS certificate or certificates.

### Originator

The financial institution or mortgage lender who originally initiates the mortgage agreement with the borrower.

### Servicer

Appointed by the sponsor and is a contractual party to the trust, to administer the mortgages loans and to collect monthly payments (e.g. principal/interest, tax, insurance). After collection, the servicer sends the funds to the trustee who then makes payment to the investors. If a borrower (mortgagee) does not make payments to the servicer as required by the mortgage documents, the servicer may have to foreclose on the property and provide property maintenance to maximize the return on the investment made by the "beneficial owners of the Trust" -- the investors. Some MBS transactions have more than one servicer. The servicer does not own the mortgages/collateral. The trustee does not designate the loan servicers, nor are the loan servicers agents of the trustee.

### Trust

Generally a special purpose entity, such as a Real Estate Mortgage Investment Conduit (REMIC), that is formed solely to hold the mortgage collateral and to issue the securities which are then sold to investors. The trust owns the pooled mortgages. The trust conducts no other business. Certificates issued by the trust represent a financial interest in a pool of mortgages owned by the trust and is the primary source of funds for payment of interest and principal due to the investors on certificates they own.

### Trustee

An independent party, responsible for administering the trust for the benefit of investors. While the trustee is listed as the owner of record, the trustee does not have an economic or beneficial interest in the loans. The trustee is the owner of the mortgage solely for the benefit of the investors in the mortgage backed securities, who are the true beneficial owners of the mortgages. The Trustee holds a security interest in the mortgaged property by having the mortgage loans assigned in the name of the trustee for the benefit of the trust (e.g. U.S. Bank as Trustee for the MBS Trust) or in the name of MERS, a Mortgage Electronic Recording System used by many of the largest financial institutions. The duties of the trustee are administrative in nature, are clearly spelled out in the MBS transaction documents, and generally are non-discretionary in nature.

For more information about U.S. Bank and our role as trustee in MBS transactions, please call (800) 236-3488 between the hours of 8 a.m. and 5 p.m. central standard time Monday through Friday.

All of **us** serving you®



usbank.com/corporatetrust

Investment and Insurance products are:

| NOT A DEPOSIT | NOT FDIC-INSURED | MAY LOSE VALUE | NOT GUARANTEED BY THE BANK | NOT INSURED BY ANY FEDERAL GOVERNMENT AGENC |
|---|---|---|---|---|

U.S. Bank is not responsible for and does not guarantee the products, services, performance or obligations of its affiliates.

R01

EXHIBIT BEE CASE # BF40-CV201700583

## HOW MONEY IS CREATED AND WHY THESE "LOANS" ARE VOID IN LAW

"The study of money, above all other fields in economics, is one in which complexity is used to disguise truth or evade truth, not to reveal it… **the process by which banks create money is so simple the mind is repelled.**" John Kenneth Galbraith *Money: Whence it Came, Where it Went* p 15 & 19

"Commercial banks **create** "checkbook money" whenever they grant a "loan", simply by **adding new deposit dollars** in accounts on their books **in exchange for a borrower's IOU.**" Federal Reserve Bank of New York; Friedman, David H. (1977) *I Bet You Thought…* p. 19 OCLC 5356154.

"In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, indorser, or guarantor for him." *Farmers and Miners Bank v. Bluefield Nat 'l Bank*, 11 F 2d 83, 271 U.S. 669.

"One institution, the commercial bank, **creates new money**, checkbook money, when it lends to producers and workers borrowing from commercial banks. The banks put this new money into circulation" *The Story of Money*, Federal Reserve Bank of New York, page 4

**"A national bank has no power to lend its credit to any person or corporation.**" *Bowen v. Needles Nat. Bank*, 94 F 925, 36 CCA 553, certiorari denied in 20 S. Ct 1024, 176 US 682, 44 LED.

1

"Commercial banks, however, lend in a different way. **They create new checkbook dollars** and lend them to a borrower's checking account. <u>Because commercial banks create almost all new dollars, they play a special role in our financial system</u>." *The Story Of Banks*, Federal Reserve Bank of New York, page 4.

"Mr. Justice Marshall said: The doctrine of "*ultra vires*" is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often. *Zinc Carbonate Co. v. First National Bank*, 103 Wis. 125, 79 NW 229." Cited in *American Express Co. v. Citizens State Bank*, 194 NW 430.

"It has been settled beyond controversy that a national bank, under federal law being limited in its powers and capacity, cannot lend its credit by guaranteeing the debts of another. All such contracts entered into by its officers are *ultra vires*". *Howard & Foster Co. v. Citizens Nat'l Bank of Union*, 133 SC 202, 130 SE759 (1926).

"…**they do not really pay out loans from the money they receive as deposits**. If they did this, no additional money would be created… when they make loans [it] is to accept promissory notes in exchange for credits to the borrower's transaction accounts. Loans (assets) and deposits (liabilities) both rise by [*an equal amount*]. *Modern Money Mechanics*, Federal Reserve Bank of Chicago, pg 6 bottom (1964)

…Reserves are unchanged by the loan transactions… the deposit credits constitute new additions to the total deposits of the banking system."   *Modern Money Mechanics*, Federal Reserve Bank of Chicago, pg 6 bottom (1964)

2

**"It is not within those statutory powers for a national bank**, even though solvent, to lend its credit to another in any of the various ways in which that might be done." *Federal Intermediate Credit Bank v. L 'Herrison*, 33 F 2d 841, 842 (1929).

"..when the Federal Reserve buys securities, it is **by the mere stroke of a pen** putting new money into the banking system, money which itself can lead to the **creation of even more** new money. **When the Federal Reserve writes a check, it is creating money**" *"Putting It Simply"*, Federal Reserve Bank of Boston, pg 17.

**"A bank can lend its money, but not its credit."** First Nat 'I Bank of Tallapoosa v. Monroe, 135 Ga 614, 69 SE 1124, 32 LRA (NS) 550. "... The bank is allowed to lend money upon personal security; but it must be money that it loans, not its credit." Seligman v. Charlottesville Nat. Bank, 3 Hughes 647, Fed Case No.12, 642, 1039.

"...bank credit isn't a one way street. It adds to our money supply, to be sure, but our money supply declines as bank credit is repaid. Banks, then, can "destroy" or "extinguish" money as well as create it." *Money: Master or Servant?* , Federal Reserve Bank of New York, pg 15.

Article 1 Section 10 United States Constitution: "no State shall make anything but gold of silver tender for payment of debt".

"Banking Associations from the very nature of their business are prohibited from lending credit." *St. Louis Savings Bank vs. Parmalee* 95 U. S. 557

3

1                                    Quarterly Bulletin 2014 Q1

https://www.bankofengland.co.uk/quarterly-bulletin/2014/q1/money-creation-in-the-modern-economy

# Money creation in the modern economy

By Michael McLeay, Amar Radia and Ryland Thomas of the Bank's Monetary Analysis Directorate.[1]

---

• This article explains how the majority of money in the modern economy is created by commercial banks making loans.

• Money creation in practice differs from some popular misconceptions — banks do not act simply as intermediaries, lending out deposits that savers place with them, and nor do they 'multiply up' central bank money to create new loans and deposits.

• The amount of money created in the economy ultimately depends on the monetary policy of the central bank. In normal times, this is carried out by setting interest rates. The central bank can also affect the amount of money directly through purchasing assets or 'quantitative easing'.

## Overview

In the modern economy, most money takes the form of bank deposits. But how those bank deposits are created is often misunderstood: the principal way is through commercial banks making loans. **Whenever a bank makes a loan, it simultaneously creates a matching deposit in the borrower's bank account, thereby creating new money.**

The reality of how money is created today differs from the description found in some economics textbooks:

• Rather than banks receiving deposits when households save and then lending them out, bank lending creates deposits.

• In normal times, the central bank does not fix the amount of money in circulation, nor is central bank money 'multiplied up' into more loans and deposits.

Although commercial banks create money through lending, they cannot do so freely without limit. Banks are limited in how much they can lend if they are to remain profitable in a competitive banking system. Prudential regulation also acts as a constraint on banks' activities in order to maintain the resilience of the financial system. And the households and companies who receive the money created by new lending may take actions that affect the stock of money — they could quickly 'destroy' money by using it to repay their existing debt, for instance.

**Monetary policy acts as the ultimate limit on money creation.** The Bank of England aims to make sure the amount of money creation in the economy is consistent with low and stable inflation. In normal times, the Bank of England implements monetary policy by setting the interest rate on central bank reserves. This then influences a range of interest rates in the economy, including those on bank loans.

In exceptional circumstances, when interest rates are at their effective lower bound, money creation and spending in the economy may still be too low to be consistent with the central bank's monetary policy objectives. One possible response is to undertake a series of asset purchases, or 'quantitative easing' (QE). QE is intended to boost the amount of money in the economy directly by purchasing assets, mainly from non-bank financial companies.

QE initially increases the amount of bank deposits those companies hold (in place of the assets they sell). Those companies will then wish to rebalance their portfolios of assets by buying higher-yielding assets, raising the price of those assets and stimulating spending in the economy.

As a by-product of QE, new central bank reserves are created. But these are not an important part of the transmission mechanism. This article explains how, just as in normal times, these reserves cannot be multiplied into more loans and deposits and how these reserves do not represent 'free money' for banks.

Click here for a short video filmed in the Bank's gold vaults that discusses some of the key topics from this article.

---

(1) The authors would like to thank Lewis Kirkham for his help in producing this article.